IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:16-cv-02450-MJW

BEVERLY CRIBARI

      Plaintiff,

v.

ALLSTATE FIRE & CASUALTY INSURANCE COMPANY

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

The Defendant, Allstate Fire & Casualty Insurance Company, through their attorneys, Tucker Holmes, P.C., submits the following Motion for Summary Judgment:

## I. SUMMARY OF ARGUMENT

Plaintiff filed claims against Defendant for breach of contract, common law bad faith, and unreasonable delay/denial, and Defendant seeks summary judgment and dismissal of Plaintiff's claims.

Plaintiff failed to satisfy conditions precedent and breached the insurance contract, by failing to comply with her duty to cooperate under the policy. Defendant attempted to evaluate Plaintiff's claim for UIM benefits, but needed additional information and documentation to complete its evaluation, including evidence relating to permanence, future treatment needs and costs, future wage loss, and mental health therapy records. Defendant repeatedly requested that Plaintiff provide this additional information and documentation, and Plaintiff repeatedly agreed

-1-

to provide the information, however, future treatment costs and estimated wage loss due to time lost at work for future treatment were never provided. The impairment rating was eventually provided, nine months after Plaintiff agreed to obtain the information. Plaintiff also failed to provide mental health records, despite an agreement to obtain and produce these records. Based upon Plaintiff's failure to cooperate, summary judgment is appropriate as to Plaintiff's claims for underinsured motorist benefits and breach of contract.

Summary judgment is also warranted on the claim for unreasonable delay or denial pursuant to C.R.S. §10-3-1115 and C.R.S. §10-3-1116. As a matter of law, Defendant has not unreasonably delayed or denied the payment of benefits because the undisputed facts demonstrate Defendant had communicated to Plaintiff that there was additional information and documentation it reasonably needed in order to complete its claim investigation. Despite repeated requests by Defendant for Plaintiff to produce this information and documentation, and Plaintiff's repeated agreements to provide the information, Plaintiff failed to provide the requested information. Thus, as a matter of law, Defendant cannot be said to have unreasonably delayed or denied payment of the claim. There has been no delay of any benefits owed due to Plaintiff's own failure to cooperate in the Investigation of her UIM claim.

Finally, there is no evidence to indicate that Defendant's actions in evaluating this claim were unreasonable and that it knew its actions were unreasonable or recklessly disregarded the unreasonableness of its actions. Defendant evaluated all information that was provided to it by Plaintiff, and each time new information was received, Defendant's evaluation increased. Plaintiff made continual promises to provide additional, material information to Defendant, so that it could continue its evaluation. Plaintiff can point to no unreasonable conduct in

Defendant's claim handling, other than its failure to evaluate her claim at policy limits. Defendant is entitled to summary judgment in its favor on Plaintiff's common law bad faith claim because Plaintiff cannot establish that Defendant either knew its conduct was unreasonable, or recklessly disregarded the unreasonableness of its conduct. Summary judgment should be granted in Defendant's favor as to Plaintiff claim for common law bad faith

## II.    MOVANT'S STATEMENT OF UNDISPUTED FACTS

1.      Plaintiff all was involved in an automobile accident on February 13, 2015, when she was hit by Steven Perko, who failed to stop at a red light.  See Document #4, Complaint and Jury Demand, p. 5.

2.      Defendant was notified of the loss on February 13, 2015.  (See **Exhibit A**, First Notice of Loss)

3.      On February 25, 2015, Defendant received a letter of representation from Franklin D. Azar & Associates.  That letter advised Defendant to contact Azar's office in order to discuss any medical treatment that Plaintiff was receiving, and that counsel would provide Defendant with any medical bills and medical records that they received.  (See **Exhibit B,** Affidavit of Paula Humphrey, ¶ 5.)

4.      On March 27 2015, Allstate adjuster Paula Humphrey reviewed the available claim materials, and UIM coverage was opened.  Her notes indicate that she was unable to determine the grand total value of the claim at the time.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 6.)

5.      On March 30, 2015, Ms. Humphrey sent a letter to Plaintiff's counsel's office acknowledging counsel's representation of Plaintiff.  In addition, that letter requested Plaintiff

return a completed notice of claim, which would provide Defendant with basic facts about Plaintiff's claim. That letter also advised Plaintiff's counsel that Defendant would work with counsel to try and resolve the claim, once Defendant received all of the information needed to complete the investigation and evaluate Plaintiff's claim. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 7.)

6.    On April 21, 2015, Defendant received a letter from Plaintiff's counsel, requesting permission to settle with the bodily injury carrier for their $100,000 policy limits. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 8.)

7.    On May 10, 2015, Ms. Humphrey wrote to Plaintiff's counsel and advised that in order to grant permission to settle, Defendant would need the tortfeasor's declaration page. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 9.)

8.    On May 27, 2015, Defendant received a copy of GEICO's $100,000 policy limit offer to Plaintiff. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 10.)

9.    On May 27, 2015, Defendant granted Plaintiff permission to settle her bodily injury liability claim with the tortfeasor for the February 13, 2015 accident. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 11.)

10.   On June 22, 2015, Ms. Humphrey again requested a signed medical authorization and wage authorization from Plaintiff, including a list of treating providers. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 12.)

11.   On August 11, 2015, Defendant received a demand letter from Plaintiff's counsel. That letter indicated that Plaintiff had over $70,000 in medical bills, over $14,000 in lost wages, and "significant non-economic losses." (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 13.)

12.     Additional medical bills were received from Plaintiff's counsel on August 21, 2015.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 14.)

13.     On September 10, 2015, Ms. Humphrey performed her evaluation of Plaintiff's claim.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 15.)

14.     On September 15, 2015, Ms. Humphrey sent a settlement offer in the amount of $35,000 to Plaintiff's counsel.  In that letter, she indicated she had considered all of the medical documentation Plaintiff's office had sent for her review.  She further explained in detail what medical bills were considered, along with any medical bills that were reduced for usual and customary rates.  Additionally, Ms. Humphrey indicated that she had considered a 7% whole person impairment due to Plaintiff's hand injury.  She also considered wage loss in the amount of $14,232.  Finally, she indicated that she had not considered any future expenses, as she had not been presented with any to review.  She noted that she considered the permanent impairment based on the information that was available to her.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 16.)

15.     Plaintiff's counsel responded on September 28, 2015 to request a further explanation of the settlement offer, including how Defendant arrived at the 7% whole person impairment and whether any of Plaintiff's lost commissions for her time off work were considered.  Plaintiff's counsel also requested information regarding the amount allowed for impairment and whether Defendant had considered Plaintiff's scar and deformity.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 17.)

16.     On October 1, 2015, Ms. Humphrey spoke to Plaintiff's attorney.  Counsel advised that Plaintiff's wrist was in constant pain and more surgeries needed to be done, but she

put them off as long as possible because of scar tissue.  She was hoping that Ms. Humphrey would meet with her.  Ms. Humphrey advised that she would be happy to meet with her.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 18.)

16. On October 9, 2015, a letter confirming a forthcoming October 22, 2015 meeting at Plaintiff's counsel's office was sent.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 19.)

18. On October 22, 2015, Ms. Humphrey met with Plaintiff at her Azar's office.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 20.)

19. A follow-up letter was sent on October 22, 2015.  In that letter, Ms. Humphrey set forth her understanding that Plaintiff was going to see her surgeon to discuss an impairment rating to her wrist and hand, as well as future surgical options and complications of the surgery.  She requested a copy of that report when it was available.  Additionally, Ms. Humphrey requested records from Plaintiff's therapist.  She advised that she would be sending another medical authorization form and treating provider list for Plaintiff to sign and fill-out.  The medical authorization letter was also sent on that same day. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 21.)

20. On October 29, 2015, Defendant received a letter from Plaintiff's counsel indicating that Plaintiff was going to see her surgeon by the end of the year and counsel would then attempt to schedule a time for her office and Defendant to meet with Plaintiff's surgeon.  She also indicated that she would obtain records from Plaintiff's therapist and provide those to Defendant.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 22.)

21. On December 15, 2015, Defendant received an email from Plaintiff's counsel advising that she was scheduled to meet with Dr. Choudhry on January 15, 2016 at 4:30 p.m. to

discuss Plaintiff.  She requested that Ms. Humphrey let her know if she would like to attend.  In response, Ms. Humphrey advised that she was unable to attend the meeting with the doctor.  She requested Dr. Choudhry's report  include any impairment rating to the wrist and hand, any future treatment options, as well as costs and any complications that are anticipated due to those surgical options.  Ms. Humphrey also again requested the signed medical and wage authorization forms.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 23.)

22.     On December 17, 2015, Defendant received completed medical and employment authorizations forms from Plaintiff.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 24.)

23.     On December 29, 2015, Ms. Humphrey requested that her processor, Julie, order wage loss information as she was not sure the original demand had clear documentation of wage loss.  She also advised Julie to hold off any records, as the attorney was going to get new records to Defendant.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 25.)

24.     On December 30, 2015, employment records were requested from Assured Title, Plaintiff's employer.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 26.)

25.     On January 7, 2016, Defendant received wage loss documentation from Assured Title.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 27.)

26.     On January 25, 2016, Defendant received correspondence from Plaintiff's counsel purporting to be the opinions of Dr. Choudhry related to Plaintiff.  The information purportedly from Dr. Choudhry was phrased in the third person point of view and indicated what "Dr. Choudhry will testify to…".  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 28.)

27.     On February 6, 2016, Ms. Humphrey reviewed the letter regarding Dr. Choudhry's opinions and determined that the letter appeared to be the attorney writing up the

doctor's opinion, not the doctor's actual written opinion.  The signature was also illegible. Ms. Humphrey followed up with Plaintiff's counsel and advised that it appeared that the document was not the doctor's actual written opinion as was discussed, and she also requested that if the doctor did not write that opinion, to forward the doctor's written opinion on all of the previously promised information, written by the doctor himself.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 29.)

28.     On February 15, 2016, Plaintiff's counsel sent correspondence indicating that the document previously referred to had been signed by Dr. Choudhry.  After discussing Dr. Choudhry's opinions, counsel drafted a summary and sent it to him.  Dr. Choudhry made changes to ensure the opinions were complete and accurate and signed it.  In response, Ms. Humphrey replied that she would review it again and that it was her understanding that Dr. Choudhry was going to examine Plaintiff and write a report, as that was what was agreed upon when they met at Plaintiff's counsel's office. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 30.)

29.     Ms. Humphrey reviewed Dr. Choudhry's opinions on February 15, 2016, and noted all of his recommendations in her evaluation, along with the fact that the attorney did not provide the projected cost of surgery or an impairment rating as promised. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 31.)

30.     After her evaluation, Ms. Humphrey noted that her new evaluation included up to $78,770 in new money, with a probable future surgery and continued problems.  She also noted her evaluation did not include any future treatment costs or future wage loss.  She felt that

$100,000 was the appropriate settlement limitation.   (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 32.)

32.     On February 16, 2016, Ms. Humphrey extended a $100,000 best settlement offer in order to settle Plaintiff's UIM claim.   She noted that Defendant was still missing information they agreed would be sought in the visit with Dr. Choudhry in order to reevaluate the matter. She noted that a disability rating still had not been received from the doctor and that Defendant still had not received cost estimates for surgeries and any additional impairment information after the future surgery.   Finally, she noted she did not receive any information regarding future wage loss or a time frame she would be off of work if she had surgery.   (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 33.)

32.     On March 2, 2016, Plaintiff's counsel responded to Defendant's February 16, 2016 letter.   In that letter, Plaintiff's counsel claimed that she was disappointed Ms. Humphrey "declined to attend the meeting with the doctor in January to inquire on any issues [Ms. Humphrey] had questions about," and that she did not have the ability to anticipate additional questions Ms. Humphrey would have regarding the physician's opinions. She advised that in order to get a disability rating or impairment rating, Dr. Choudhry would again have to see Ms. Cribari and do an evaluation to provide that information.   Plaintiff's counsel requested that Defendant pay for that visit in order to have the evaluation.   Plaintiff's counsel also requested that Defendant advise her how she could help with Defendant's investigation of the information regarding the cost of potential surgeries, wage loss related time off for surgery and her impairment following surgery.   She also requested Defendant let her know what investigation it

had done so far.  Finally, she advised that it was Plaintiff's position that this is a policy limits case.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 34.)

33.     Ms. Humphrey responded on March 14, 2016, advising that she was previously unable to attend the meeting proposed with Plaintiff's physician, as she did not have any input as to when that meeting was going to take place.  She also advised that if Plaintiff needed to schedule a second appointment to address permanency, cost of future surgeries, and how much time would be missed for work, Defendant did not have a problem paying for the additional visit, however, she was not sure why it had not been addressed at previous visits. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 35.)

34.     On March 24, 2016, Plaintiff's counsel responded advising that she would contact Orthopedic Associates to facilitate Plaintiff seeing her physician to obtain the information Defendant needed to evaluate her claim, including the impairment rating, physician charges for the future surgery, and the amount of time she would likely miss from work.  Plaintiff's counsel also advised that with regard to the future surgeries, the information was not obtained from Dr. Choudhry until she met with the doctor in January, and **could not have been addressed prior to that**.  Plaintiff also requested explanation of the $100,000 offer. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 36.)

35.     The March 24, 2016 letter was not received by Ms. Humphrey until on or about April 21, 2016, as Plaintiff's counsel had sent the letter to the medpay claim address in Iowa. (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 37.)

36.     On April 20, 2016, Defendant received an email from Plaintiff's counsel with an attached invoice for the impairment rating, and a request to let her know if Defendant wanted anything in particular answered.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 38.)

37.     On April 21, 2016, Ms. Humphrey advised Plaintiff's counsel that Defendant needed all future surgical costs, wage loss time and amounts, a disability and impairment rating, and whether the disability rating would be different after surgery.  She also wanted to know if there were any permanent restrictions and whether she would be in the brace permanently, with or without the surgery.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 39.)

38.     Ms. Humphrey also followed up on April 21, 2016 and advised Plaintiff's counsel that she had not received the previous March 24, 2016 letter because it was sent to the medpay claims address and she advised that she would respond to the March 24th letter.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 40.)

39.     On April 22, 2016, Ms. Humphrey sent Plaintiff's counsel a letter explaining Defendant's previous $100,000 offer of settlement.  She explained the amount of medical bills considered, the amount of wage loss considered and that the offer was based on the information received, as well as some assumption on Defendant's part for the future, in an attempt to settle the matter as Defendant did not yet have all of the information.  She advised that Plaintiff's counsel had not yet provided an impairment rating so there was no number to use in the settlement.  Finally, she acknowledged that Defendant did acknowledge that Plaintiff continued to have difficulties and is considering future treatment.  She did not have any additional treatment records showing Plaintiff was currently participating in additional treatment.    (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 41.)

40.     On July 12, 2016, Defendant received a copy of Dr. Choudhry's June 23, 2016 report regarding his May 13, 2016 visit with Plaintiff.  Dr. Choudhry's report gave Plaintiff an 11% whole person impairment.  He also advised that he did anticipate that Plaintiff's pain would gradually get worse as the years go by and may necessitate another surgery at some point in the future.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 42.)

41.     On July 27, 2016, Ms. Humphrey reevaluated Plaintiff's claim with the new information received from Dr. Choudhry.  She evaluated the claim at up to $120,000 in new money, as she still did not have any information regarding the future costs of the potential surgeries.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 43.)

42.     On August 8, 2016, Ms. Humphrey sent a settlement offer in the amount of $115,000 to Plaintiff's counsel, advising that the offer took into consideration all information received, including the new impairment rating from Dr. Choudhry.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 44.)

43.     No response was ever received from Plaintiff's counsel and suit papers were received by Defendant on September 8, 2016.  (See **Exhibit B**, Affidavit of Paula Humphrey, ¶ 45.)

44.     On July 26, 2017, Defendant deposed Dr. Imran Choudry. He testified that he gave an informal estimate of future surgical costs to Plaintiff's counsel (**Exhibit C**, July 26, 2017 Deposition of Imran Choudry, pp. 31:10-32:14.)

45.     Dr. Choudry also testified to speaking with Liz Kattman (Plaintiff's vocational rehabilitation expert) regarding Plaintiff's "rehab and future use," and "future procedures that may be done." (**Exhibit C**, July 26, 2017 Deposition of Imran Choudry, pp. 33:18-34:19.)

46.     With Plaintiff's First Supplemental Disclosures, received on February 7, 2017, Defendant received for the first time, a letter from Liz Kattman to Dr. Choudry, allegedly summarizing a June 8, 2016 conversation they had regarding Plaintiff. (**Exhibit D**, Plaintiff's First Supplemental Disclosures, **Exhibit E**, June 30, 2016 Letter from Liz Kattman to Imran Choudhry.) Plaintiff admitted that she did not provide this document to Defendant prior to litigation. (**Exhibit F**, Plaintiff's Responses to Defendant's Second Request for Admission, Request for Admission 2.)

47.     Plaintiff has Disclosed Liz Kattman as a vocational rehabilitation expert.  Ms. Kattman's report discusses Plaintiff's future treatment and care needs.  (See, **Exhibit G**, Plaintiff's Expert Disclosures; see also, **Exhibit H**, May 11, 2017 Report of Liz Kattman.)

48.     During Ms. Kattman's deposition, she testified that the first time she talked to Plaintiff was May 19, 2016. (**Exhibit I**, Deposition of Liz Kattman, pp. 15:13-19.)

49.     Ms. Kattman's report sets forth a future surgery cost estimate, along with estimates for additional future care needs. (**Exhibit H**, May 11, 2017 Report of Liz Kattman.)

50.     During her deposition, Plaintiff testified that she has been seeing a therapist once a week since the date of the accident. (See, **Exhibit J**, Plaintiff's Deposition, pp. 26:1-29:15.)

51.     To date, Defendant has not received, and Plaintiff has not produced with any of her disclosures, mental health therapy records or any information regarding her therapist.  (See, **Exhibits K, D, L, M, N**, and **O** Plaintiff's Initial, First, Second, Third, Fourth and Fifth Supplemental Disclosures, respectively.)

52.     Plaintiff economic expert, Jeffrey Nehls, has opined that the total net present value of Plaintiff's future medical/life care expenses are $341,700. (See, **Exhibit P**, May 12,

2017 report of Jeffrey E. Nehls, p. 8.) This information was also not provided until Plaintiff's expert disclosures were received on May 12, 2017.

## III. <u>LEGAL AUTHORITY AND ARGUMENT</u>

Pursuant to Fed.R.Civ.P. 56(b), "[a] party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." In this regard, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). The purpose of summary judgment is to isolate and then terminate claims and defenses that are factually unsupported. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986).

Rule 56 "imposes no requirement on the moving party to 'support its motion with affidavits or other similar material negating the opponents' claim.'" *John Hancock Mutual Life Ins. Co. v. Weisman*, 27 F.3d 500, 503 (10th Cir. 1994) (quoting *Celotex* at 2553). Rather, the moving party simply "bears the initial burden of showing an absence of evidence to support the nonmoving party's case." *Celotex*, at 2554. "Once the moving party meets this burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, at 2554).

The party opposing the motion may not satisfy this burden by resting on mere allegations, but must respond with specific facts showing the existence of a genuine factual issue to be tried.

*Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980). "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed.R.Civ.P. 56(e). Judgment for the moving party is appropriate when the non-moving party fails to make an adequate showing on an essential element of its case, as to which it has the burden of proof. *Cleveland v. Policy Mgmt. Sys. Corp.*, 119 S.Ct. 1597, 1603 (1999).

Here, Defendant will demonstrate, through affidavits, documents and undisputed facts, that it did not have the information needed to evaluate Plaintiff's claims for UIM benefits. Without such information, Defendant could not complete its evaluation of Plaintiff's claim. Defendant will also demonstrate through affidavits and documents that it conducted a reasonable investigation of Plaintiff's UIM claim.

## IV. LEGAL ARGUMENT

A. **Plaintiff's breach of contract claim against Defendant fails as a matter of law because the Plaintiff breached the insurance contract and failed to satisfy a condition precedent to coverage by failing to cooperate with Defendant's investigation of her claim.**

Pursuant to Colorado law, "a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F.Supp.2d 1161, 1170 (D.Colo. 2003).

Plaintiff cannot satisfy the second element of her claim for breach of contract. The insurance policy requires the cooperation of the policyholder, and Plaintiff failed to cooperate with material terms of the Policy, without justification for her nonperformance.

An insurance policy is a written contract and, as such, its construction is to be determined as a matter of law. *United States Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 211 (Colo. 1992). Insurance policies must be enforced as written, unless a policy term is ambiguous. *Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994). Insurance policy language is ambiguous only where it is susceptible to more than one meaning. *Id*.; *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993); *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991). Under Colorado law, if the terms of a contract are plain and unambiguous, the contract may not be rewritten by the court, nor may its effect be limited. *Gulf Ins. Co. v. State*, 607 P.2d 1016, 1018 (Colo.App. 1979).

While there is no specific language that makes the occurrence of an event a condition precedent, such words as "on condition that," "provided that," and "if" are often used for this purpose. Restatement (Second) of Contracts § 226 cmt. a (1981); *see also Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 248 (Colo.App. 2004) (holding that "provided that" generally establishes a condition precedent). At least one Colorado court has held that compliance with the physical examination provision of the policy was a condition precedent to the plaintiff's recovery under the policy. *Jensen v. American Family Mut. Ins. Co.*, 683 P.2d 1212, 1213-1214 (Colo.App. 1984). In reaching its holding, the *Jensen* court referenced Restatement (Second) of Contracts § 225(1) which states: "[P]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." *Jensen*, 683 P.2d at 1214. The court concluded that an insured's refusal to submit to examinations by a physician results in a forfeiture of coverage. *Id*.

-16-

The Colorado Federal District Court, in applying Colorado law, also reached the same holding as the court in *Jensen*. In *Harris v. Allstate Ins. Co.*, 2010 WL 2543560, the Plaintiff refused to submit to an independent medical examination and also refused to sign medical and employer authorizations, which were requested by Allstate. In addressing these issues and in granting summary judgment in favor of Allstate on the Plaintiff's breach of contract claim, the court explained the following:

> Plaintiff also refused to provide signed authorizations, and by doing so she refused to cooperate with Allstate. Plaintiff failed to satisfy the conditions precedent to coverage. No reasonable trier of fact could conclude otherwise.
>
> Accordingly, I conclude that Allstate is entitled to judgment as a matter of law on Plaintiff's claim for breach of contract.

*Id.*

Even if a contract does not contain the usual terms associated with a condition precedent, a condition precedent may still exist. In order to determine if a contract contains a condition precedent in lieu of a promise, the entire agreement must be examined in order to ascertain the parties' intent. *Southern Sur. Co. v. MacMillan Co.*, 58 F.2d 541 (10th Cir. 1932). A condition precedent exists when the contract provides that the obligations of one of the parties are contingent upon the performance or acts of the other party. *Id.* at 547.

Colorado law also recognizes that the right to recover under an insurance policy may be forfeited when, in violation of a policy provision, the insured fails to cooperate with the insurer in some material and substantial respect and the failure to cooperate causes material and substantial disadvantage to the insurer. *State Farm Mut. Auto. Ins. Co. v. Secrist*, 33 P.3d 1272, 1275 (Colo. App. 2001). Proof of an insured's prejudicial noncooperation will likely bar a claim

for benefits. *See*, *Soicher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 46, ¶ 26, 351 P.3d 559, 565. The purpose of a cooperation clause is to protect the insurer in its defense of claims by obligating the insured not to take any action intentionally and deliberately that would have a substantial, adverse effect on the insurer's defense, settlement, or other handling of the claim. *State Farm Mut. Auto. Ins. Co. v. Secrist*, 33 P.3d at 1275.

Where an insured seeks coverage for a loss already sustained, whether the insurer suffered a material and substantial disadvantage is determined by:

> [W]hether the insurer has been able to complete a reasonable investigation with regard to whether the insured's claim is valid. If the insured's refusal to cooperate prevents the insurer from completing such a reasonable investigation, prejudice should be found to exist. Specifically, it has been held that the insurer can deny coverage, following an insured's refusal to provide documents reasonably requested by the insurer, on the basis that the insurer has been prejudiced because the insured's refusal prejudices the insurer by putting the insurer in the untenable position of either denying coverage or paying the claim without the means to investigate its validity.

*Walker v. State Farm Fire & Cas. Co.*, No. 16-CV-00118-PAB-STV, 2017 WL 1386341, at *3– 4 (D. Colo. Feb. 23, 2017), *report and recommendation adopted sub nom. RAYSHUN WALKER, Plaintiff, v. STATE FARM FIRE & CASUALTY COMPANY, Defendant.*, No. 16-CV-00118- PAB-STV, 2017 WL 1386346 (D. Colo. Mar. 17, 2017), quoting 1 Allan D. Windt, *Insurance Claims & Disputes* § 3.2 (6th ed. 2016).

Although the question of whether an insured violated an insurance policy by failing to cooperate is generally a question of fact, if "the record can produce no other result, [a court] may determine the issue of non-cooperation as a matter of law." *Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo. App. 1989). When the insured's failure to provide some of the requested records is undisputed, the court may determine their relevance to the insurer's investigation as a matter of

law. *Walker v. State Farm Fire & Cas. Co.*, 2017 WL 1386341, at *4, citing *Doerr v. Allstate Ins. Co.*, 121 Fed.Appx. 638, 641 (6th Cir. 2005).

> In the case at bar, the terms of the Policy are clear:
>
> Medical Reports
> The injured person may be required to take medical examinations by physicians we choose, as often as we reasonably require. We must be authorized to obtain medical reports and other records pertinent to the claim.
>
> Assistance And Cooperation Of The Insured
> An insured person must cooperate with us in the investigation, settlement and defense of any claim or lawsuit. . . .

[See, **Exhibit Q**, excerpt from the Certified Policy issued to Beverly Cribari, Bates Label p. Allstate 000167.] The plain language of the policy requires the Plaintiff to "cooperate with [Defendant] in the investigation…of [his] claim" and to also provide Defendant with authorization to obtain records pertinent to the claim. The policy also requires the Plaintiff to comply with all of the policy terms in order to bring suit against Defendant. [See, **Exhibit Q**, excerpt from the Certified Policy issued to Beverly Cribari, Bates Label p. Allstate 000182-000183.]  Since these policy terms are not ambiguous, their effect should not be limited. *See*, *Gulf Ins. Co. State*, 607 P.2d at 1018.  The Plaintiff's breach of contract claim must fail as a matter of law since she is the only party who breached the contract by failing to cooperate and comply with all terms of the subject insurance contract.

In analyzing the Plaintiff's lack of cooperation with Defendant's investigation of her UIM claim, it is undisputed that Plaintiff failed to provide Defendant with relevant medical records that were requested by Defendant regarding a material aspect of the claim she submitted, i.e. information regarding her alleged need for future surgical treatment, so that Defendant had a fair opportunity to fully consider and evaluate Plaintiff's claim. The requested information

-19-

related to Plaintiff's claims for future medical costs, her claims of future lost wages, and her claims of anxiety caused by the accident.

The undisputed facts clearly show that this information was requested on numerous occasions from Plaintiff and, on numerous occasions, she agreed to provide it. With her September 15, 2015 offer of settlement, Ms. Humphrey advised Plaintiff that she had not considered future expenses, as she had not been provided with any to review.  On October 22, 2105, Ms. Humphrey met with Plaintiff and subsequently summarized their meeting, and the information she was requested.  This information included an impairment rating to her wrist and hand, future surgical options, and complications of the surgery.  Ms. Humphrey also requested initial records from Plaintiff's therapist. On October 29, 2015, Plaintiff advised that she was going to see her surgeon by the end of the year, and counsel would then schedule a time for her office and Defendant to meet with Plaintiff's surgeon.  Plaintiff's counsel also advised that she would obtain records from Plaintiff's therapist, and provide those records to Defendant.  Those records have still not been produced to this day.

On December 15, 2015, Ms. Humphrey was advised of a unilaterally scheduled meeting between Dr. Choudhry and Plaintiff's counsel, and she was invited to attend.   Since Ms. Humphrey was unavailable, she requested that Dr. Choudhry's report provide an impairment rating to the wrist and hand, any future treatment options, as well as costs, and any complications that were anticipated due to those surgical options.  On February 6, 2016, Plaintiff's counsel sent over a summary prepared by counsel of a conversation she had with Dr. Choudhry, which had been reviewed and signed by Dr. Choudhry. This summary still did not contain the requested information that Plaintiff agreed to provide regarding permanent impairment or future care costs.

On February 16, 2016, after evaluating all of the new information received, Ms. Humphrey extended another settlement offer, noting in that letter that Defendant was <u>still</u> missing information the parties had agreed would be sought in the visit with Dr. Choudhry, in order for Defendant to re-evaluate the claim. She noted that a disability rating still had not been received from the doctor and that Defendant still had not received cost estimates for surgeries and any additional impairment information after the future surgery.  Finally, she noted she did not receive any information regarding future wage loss, if she has a surgery, or any information on a time frame she would be off of work.

Despite having previously agreed to provide the information to Defendant, Plaintiff responded on March 2, 2016, by advising—for the first time—that an additional visit would be required to get the impairment rating, and inquired as to what she could do to help get the additional information requested.  Defendant subsequently agreed on March 14, 2016 to pay for Plaintiff to attend another appointment with Dr. Choudhry to address permanency, cost of future surgeries, and how much time would be missed for work.

In a March 24, 2016 letter (which was not received until April 21, 2016, due to a mailing error on Plaintiff's part), Plaintiff's counsel advised that they would facilitate Plaintiff seeing her physician to obtain the information needed to evaluate her claim, including the impairment rating, physician charges for the future surgery, and the amount of time Plaintiff would likely miss from work. At that time, Plaintiff also advised that the information regarding future surgeries could not have been addressed prior to her January 2016 meeting with Dr. Choudhry, because that was when she obtained the information.  Despite Plaintiff's position that <u>she</u> could

not even address the future surgery prior to that date, Plaintiff still alleges it was unreasonable for Defendant not to do so.

On April 21, 2016, Defendant again advised Plaintiff regarding all of the information it was requesting from Dr. Choudhry, including all future surgical costs, time lost from work, a disability and impairment rating, whether the disability rating would be different after surgery, permanent restrictions, and whether Plaintiff would be in the brace permanently, with or without the surgery. The following day, Defendant sent another letter advising that Plaintiff still had not provided a permanent impairment rating, and that although Plaintiff is considering future treatment, Defendant did not have any records showing Plaintiff was treating at that present time.

On July 12, 2016, Defendant received Dr. Choudhry's report from his May 13, 2016 visit with Plaintiff.  Defendant timely reviewed that information on July 27, 2016, and upon review, Defendant increased its settlement offer.  However, Defendant **still** did not have any information regarding the future costs of the potential surgeries.  A settlement offer was sent to Plaintiff on August 8, 2016, and no response was ever received.

 Defendant has subsequently learned through this litigation that the information regarding Plaintiff's claimed future damages, including the estimated amount of future surgery was available to Plaintiff prior to her filing this lawsuit. In fact, Plaintiff was actively seeking and retaining experts, in order to evaluate this information. On or before May 19, 2016, Plaintiff had retained Ms. Liz Kattman to perform a vocational rehabilitation evaluation and prepare a life care plan, both of which address her future treatment needs and costs. Dr. Choudhry had also spoken with Plaintiff's counsel, and provided a rough estimate of the amount of surgery.  Yet,

Plaintiff refused to provide this information to Defendant, so that Defendant could continue to evaluate these other aspects of her claim.

Plaintiff's continued promises to provided Defendant with the requested information regarding future treatment costs, future wage loss, and future, post-surgical impairment, is clearly a breach of her duty to cooperate with Defendant's investigation of her claim. This information was clearly material to Defendant's investigation and evaluation of Plaintiff's claim, particularly in light of the fact that her future  damages in this case are alleged to be over $341,000.

Plaintiff's failure to cooperate with Defendant's investigation means she failed to comply with another specific condition in the policy which unambiguously states that a lawsuit cannot be brought against Defendant unless there has been full compliance with all terms of the policy. The record undoubtedly reflects that the Plaintiff chose to file a lawsuit despite her noncooperation during Defendant's claim investigation. No reasonable juror could disagree that Plaintiff's noncooperation constitutes a failure to fully perform her duties under the policy.

Plaintiff's refusal to provide the requested information needed to fully evaluate her claim, as she is required to do under the policy, prejudiced Defendant in two meaningful ways.  First, the failure to cooperate prevented Defendant from completing an evaluation of Plaintiff's claim, and left Defendant without sufficient information to determine the extent of Plaintiff's claimed injuries, damages or losses. Second, Defendant has been prejudiced by virtue of the fact that it has had to expend substantial time and resources defending itself in this lawsuit from claims that it unreasonably delayed its evaluation of Plaintiff's claim, where any such delay has been caused by Plaintiff's own failure to cooperate by refusing and failing to provide Defendant with relevant

information regarding a material aspect of her claim.

Under Colorado law, where a plaintiff materially breaches a contract, the plaintiff is not permitted to enforce the terms of that contract. *See, e.g., Malott & Peterson Grundy, Inc. v. Reynolds Canst. Co.,* 472 P.2d 701 (Colo.App. 1970). Colorado courts have specifically held that where an insured breaches the cooperation clause of an insurance policy to the prejudice of the insurer, the insured is likewise not permitted to enforce the terms of the contract and unable to collect benefits pursuant to the contract. *E.g., Hansen v. Barmore,* 779 P.2d 1360, 1364 (Colo.App. 1989). Here, because Plaintiff has failed to comply with her duty to cooperate regarding her claim, she is barred from enforcing the terms of the contract and cannot recover UIM benefits pursuant to the contract.

**B. Plaintiff's claim for Unreasonable Delay or Denial pursuant to C.R.S. § 10-3-1115(1)(1) and C.R.S. § 10-3-1116(1) fails because Defendant did not unreasonably delay benefits owed.**

Plaintiff's Second Claim for Relief alleges Defendant's delay or denial of Plaintiff's claim for UIM benefits was unreasonable. Plaintiff's claim for violations of C.R.S. §§ 10-3-1115 & 1116 requires a showing that Defendant unreasonably delayed or denied benefits owed to the Plaintiff. In order for Plaintiff to prevail on her statutory unreasonable delay/denial claim, she must first prove entitlement to benefits. *Edge Constr., LLC v. Owners Ins. Co.*, No. 14-CV-00912-MJW, 2015 WL 4035567, at *6 (D. Colo. June 29, 2015), aff'd sub nom. *Sable Cove Condo. Ass'n v. Owners Ins. Co.*, 668 F. App'x 847 (10th Cir. 2016). "There are no benefits owed under the policy . . . if the insured failed to cooperate." *Id.* As set forth above, Plaintiff failed to cooperate with Defendant, and there are no benefits owed to her under the policy. Since

Plaintiff is not entitled to benefits under the insurance policy, Defendant is entitled to summary judgment on Plaintiff's claim for violation of C.R.S. § 10-3-1115/1116.

Additionally, an insurer may deny invalid claims and those lacking supporting documentation, and this limits the insurer's duty of good faith. *Dean v. Allstate Ins. Co.*, 878 F.Supp. 1397, 1403 (D.Colo. 1993) (Matsch, J.) (finding insurer had reasonable basis for denying claim for unsupported and undocumented losses as a matter of law). Colorado Insurance Regulations call for an insurer to evaluate an insured's claim sixty days after receipt of a valid and complete claim. 3 C.C.R. 702-5:5-1-14 § 4(A)(1); *see also Rabin v. Fidelity Nat. Property and Cas. Ins. Co.*, 863 F.Supp. 2d 1107, 1114 (D. Colo. 2012) (Babcock, J.). A decision must be made within sixty days unless there is a reasonable dispute. 3 C.C.R. 702-5:5-1-14 § 4(A)(1). A reasonable dispute may include information necessary to make a decision on the claim that has not been submitted or obtained. 3 C.C.R. 702-5:5-1-14 § 4(A)(2) (b). "[A] 'reasonable dispute' may include, among other things, the commencement of litigation or the existence of 'conflicting information' that necessitates additional investigation." *Spendrup*, 2014 WL 321155 *4 (*citing* 3 C.C.R. 702-5:5- 1-14 § 4(A)(2) (b)) (granting summary judgment on claim of violation of § 10-3-1115 in favor of the insurer when there was a genuine disagreement as to the amount of compensable damages). Thus, the inability to determine the loss claimed justifies a lack of payment of benefits while an insurer is awaiting a complete claim file. 3 C.C.R. 702-5:5-1-14 § 4(A)(2) (b); *Savio*, 706 P.2d at 1274; *Dean*, 878 F.Supp. at 1403; *Spendrup*, 2014 WL 321155 *4.

In considering a claim for unreasonable delay or denial pursuant to C.R.S. §§ 10-3-1115 or 10-3-1116, "[t]he reasonableness of an insurer's conduct is "determined objectively, based on

proof of industry standards." *Baker v. Allied Property and Cas. Ins. Co.,* 2013 WL 1397297, *13 (D.Colo 2013); *quoting Goodson v. Am. Standard Ins. Co. of Wisconsin,* 89 P.3d 409, 415 (Colo.2004). As set forth above, Defendant made more than reasonable efforts to obtain the information it needed to evaluate Plaintiff's insurance claim, but was thwarted by Plaintiff's decision to not provide reasonably requested information regarding the future cost of treatment, future lost wages, treatment for her anxiety, or any post-surgical impairments or limitations. Additionally, despite an agreement on October 22, 2015 that Plaintiff would have her doctor provide an impairment rating, Plaintiff did not advise Defendant until March 2, 2016, that another visit with her physician was needed. This was well after Plaintiff's counsel spoke with Dr. Choudhry in January 2016. Nonetheless, Defendant promptly agreed to pay for that visit to obtain the information it needed. Plaintiff then visited Dr. Choudhry to obtain the impairment rating on May 13, 2016. Dr. Choudhry's June 23, 2016 report was not sent to Defendant for over a month. After Defendant received that information on July 12, 2016, it timely reviewed the information on July 27, 2016, and its evaluation of Plaintiff's claim increased.

Plaintiff's refusal to provide clearly relevant and material information, and her delays in providing promised information, cannot be attributed to Defendant. Here an objective determination regarding Defendant's conduct based on the undisputed facts reveals Defendant's claim handling conduct was reasonable, and there exists no evidence to the contrary. As there is no evidence Defendant unreasonably delayed or denied anything with respect to Plaintiff's claim, summary judgment should be granted.

**C. Defendant is entitled to summary judgment in its favor on Plaintiff's claim for common law bad faith because Defendant's conduct in handling Plaintiff's UIM claim was reasonable as a matter of law.**

Plaintiff's Third Claim for Relief, "Bad Faith," alleges that Defendant breached its duty of good faith and fair dealing.  In terms of the claim that Defendant acted in bad faith, Plaintiff cannot set forth any facts to establish that Defendant acted unreasonably and that it knew or recklessly disregarded the fact that its conduct was unreasonable. In the absence of any facts identifying the alleged unreasonable conduct by Defendant, Plaintiff's claim must fail.

In order to succeed on her claim for common law bad faith breach of contract, Plaintiff has the burden to prove by a preponderance of the evidence, each of the following elements: (1) Plaintiff had injuries, damages, and/or losses; (2) Defendant acted unreasonably in handling Plaintiff's claim for UIM benefits; (3) Defendant knew its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable; and (4) Defendant's unreasonable conduct was a cause of Plaintiffs damages. *See* Colo. Jury Instr., Civil25:2 (4th ed.); *see also, Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1274 (Colo.1985); *see also, Pham v. State Farm Mut. Auto. Ins. Co.,* 70 P.3d 567, 572 (Colo.App.2003). In a first-party case such as this, Plaintiff must prove more than simple negligence to establish bad faith.  *Travelers Ins. Co. v. Savio*, 706 P.2d at 1276.  Therefore, it is not enough for the Plaintiff to argue that Defendant's conduct was unreasonable.  To respond to a motion for summary judgment in a case in which the Plaintiff is asserting that the insurer's settlement position constitutes bad faith, it is incumbent upon Plaintiff to establish that there is no reasonable basis for Defendant's position.  Plaintiff must establish that there was no reasonable basis for Defendant's decision not to pay the benefits that were demanded. Further, Plaintiff must establish that Defendant also knew or disregarded the fact that its conduct was unreasonable.

Plaintiff cannot prove Elements 2, 3, or 4 of her claim for common law bad faith, each of which requires a showing of unreasonable conduct on behalf of Defendant in its handling of Plaintiff's claim for UIM benefits

The determination of whether an insurer has in bad faith breached its duties to its insured "is one of reasonableness under the circumstances." *Pham,* 70 P.3d at 572. The insured bears the burden of establishing "the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted." *Id.* This standard of care "reflects a reasonable balance between the right of an insurance carrier to reject a noncompensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim of its insured." *Savio,* 706 P.2d at 1275.

In reviewing a bad faith claim, "the reasonableness of an insurer's conduct is measured objectively based on industry standards." *Zolman v. Pinnacol Assurance,* 261 P.3d 490, 496 (Colo.App.2011 ). Under Colorado law, an insurer acts reasonably when challenging claims that are "fairly debatable." *See Savio,* 706 P.2d at 1275 (quoting *Anderson v. Cant't Ins. Co.,* 271 N.W.2d 368, 377 (Wisc.l978)); *Zolman,* 261 P.3d at 496-97 (collecting cases); *Brennan v. Farmers Alliance Mut. Ins. Co.,* 961 P.2d 550, 557 (Colo.App.1998). Ordinarily, what constitutes reasonableness under the circumstances is a question of fact for the jury. *Bankr.Estate of Morris v. COPIC Ins. Co.,* 192 P.3d 519, 524 (Colo.App.2008).  In appropriate circumstances, however, "as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Zolman,* 261 P.3d at 497 (citing *Bankr.Estate of Morris,* 192 P.3d at 524).

Defendant's conduct in evaluating Plaintiff's claim was reasonable. Upon receipt of Plaintiff's Demand, all materials were reviewed.  Defendant considered all of the materials provided to it in its evaluation of Plaintiff's claims, and each time new information was received, a new evaluation was performed.

Division of Insurance amended regulation 5-1-14 provides guidance and support for Defendant's position that its conduct was not unreasonable, and that it complied with industry standards. Amended regulation 5-1-14 provides that an insurer needs to make a decision to pay benefits under a policy within 60 days after a valid and complete claim has been received, if there is not a reasonable dispute between the parties and the insured has complied with the terms and conditions of the policy. 3 C.C.R. 702-5:5-1-14 § 4(A)(1). In determining if there is a completed claim, the regulation indicates that a claim may be complete if: (5) there are no indicators on the claim requiring additional investigation; (7) negotiations or appraisals to determine the value of a claim have been completed; (8) any litigation on the claim has been fully and finally adjudicated. 3 C.C.R. 702-5:5-1-14 § 4(A)(2)(a). Further, the regulation indicates that a reasonable dispute may include, but is not limited to: (1) information necessary to make a decision has not been submitted; (2) conflicting information is submitted or obtained; (7) negotiations or appraisals are in process to determine the value of the claim.  3 C.C.R. 702-5:5-1-14 § 4(A)(2)(b). The insurance regulations recognize if there is not a completed claim because of the need for additional information, or there is conflicting information, there is no duty to pay the claim.

Here, it was not unreasonable for Defendant not to pay Plaintiff, since there was not a complete claim.  A reasonable dispute existed between Plaintiff and Defendant, and negotiations

were in progress. Plaintiff disagreed with the value Defendant placed on her claim. Plaintiff felt her claim was worth policy limits, and Defendant evaluated her claim below policy limits. Despite Defendant's continued requests for additional information to support increasing the value it had placed on her claim, Plaintiff chose to file suit instead of providing the information to complete her claim.

Once the insurer sets forth that there is no basis for the claim of bad faith, Plaintiff must come forward with admissible evidence that supports her claim of bad faith. Plaintiff cannot simply rely on conclusory allegations *Meuser v. Rocky Mountain Hospital*, 685 P.2d 776 (Colo.App. 1984).  Plaintiff may have a different opinion regarding the value of her claim. Plaintiff cannot contest that Defendant evaluated Plaintiff's claims based on the information it was provided.   Plaintiff cannot allege that Defendant acted in bad faith simply because Defendant disagreed with her valuation of her claims for benefits.

There is no evidence to indicate that Defendant's actions were unreasonable and that it knew its actions were unreasonable or recklessly disregarded the unreasonableness of its actions. Even if the Court cannot conclude as a matter of law that Defendant's conduct was objectively reasonable, Defendant is entitled to summary judgment in its favor on Plaintiff's common law bad faith claim because Plaintiff cannot establish that Defendant either knew its conduct was unreasonable, or recklessly disregarded the unreasonableness of its conduct. To the contrary, Defendant's actions in reviewing and evaluating all of the information it had been presented with was reasonable and within industry standards, and judgment should be entered in Defendant's favor on Plaintiff's claim for bad faith breach of contract.

## IV.   <u>CONCLUSION</u>

Plaintiff failed to cooperate and withheld facts regarding her claim, precluding her from obtaining benefits under the insurance policy, and from enforcing any terms of that policy. Further, Plaintiff cannot establish that Defendant unreasonably delayed or denied payment on her claim for underinsured motorist benefits under C.R.S. § 10-3-1115 or C.R.S. § 10-3-1116, because it was Plaintiff who failed to provide material information that was requested numerous times.

WHEREFORE, for all of the foregoing reasons, Defendant Allstate Fire and Casualty Insurance Company respectfully requests that the Court GRANT Defendant's Motion for Summary Judgment pursuant to F.R.C.P. 56(a) and enter an ORDER dismissing Plaintiff's claims for relief.

DATED:  August 14, 2017

Respectfully submitted,

By: *s/ Kurt H. Henkel*
Kurt H. Henkel
Nicole L. King
Winslow R. Taylor, III
TUCKER HOLMES, P.C.
Quebec Centre II, Suite 300
7400 East Caley Avenue
Centennial, CO  80111-6714
Phone:  (303) 694-9300
Fax:  (303) 694-9370
E-mail: khh@tucker-holmes.com; nlk@tucker-holmes.com; and wrt@tucker-holmes.com
*Attorneys for Allstate Fire & Casualty Insurance Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 14, 2017, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Patricia A. Meester
DezaRae D. LaCrue
Franklin D. Azar & Associates, P.C.
14426 East Evans Avenue
Aurora, CO 80014
meesterp@fdazar.com
lacrued@fdazar.com

*The duly signed original held in the file located at Tucker Holmes, P.C.*

  */s/ Kristina L. Johnson*
 Kristina L. Johnson