ALAN D. SWEETBAUM
JON F. SANDS
BRAD RAMMING
CAROLYN ABRAHAMS
GEOFFREY P. ANDERSON
JOSHUA D. MCMAHON
KATHERINE KARAMALEGOS KUST
ANDREW S. MILLER
REAGAN LARKIN
CARIN RAMIREZ
JEREMY BALU

Special Counsel:
HARLAN S. ABRAHAMS
MARILYN S. CHAPPELL
STEVEN M. SOMMERS

**SWEETBAUM SANDS ANDERSON PC**
ATTORNEYS AT LAW
1125 SEVENTEENTH STREET, SUITE 2100
DENVER, COLORADO 80202
Telephone (303) 296-3377  Facsimile (303) 296-7343

www.SweetbaumSands.com

STEPHEN W. ARENT (Retired)
SCOTT L. LEVIN (Retired)
FREDRIC J. LEWIS(Retired)

In Memoriam:
KIMBERLE E. O'BRIEN (1955 – 2013)

writer's e-mail address:
jsands@SweetbaumSands.com

May 12, 2017

Kurt H. Henkel, Esq.
Nicole L King, Esq.
Tucker Holmes, PC
7400 E. Caley Ave., Suite 300
Centennial, CO 80111-6714

     Re:   *Beverly Cribari v. Allstate Fire and Casualty Insurance Company*
          United States District Court Case No. 16-cv-02450-WJM
          Our File No.: W228-006

Dear Mr. Henkel and Ms. King:

You have asked me to review the above referenced matter and offer my conclusions and opinions as to the conduct of the named defendant, Allstate Property and Casualty Insurance Company. I will refer to the insurer as "Allstate" in this correspondence.

## I.    DOCUMENTS REVIEWED

I have reviewed the following documents:

- Initial Case Pleadings;

- Plaintiff's Initial, First, and Second Supplemental Disclosure documents;

- Defendant's Initial Disclosure documents and Privilege Log; and

- Plaintiff's Responses to Written Discovery.


EXHIBIT
1

S̶weetbaum S̶ands A̶nderson PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 2

## II.      CHARGES AND TIME SPENT

I am charging $300 per hour for my services.

## III.      PRIOR TESTMONY AND PUBLICATIONS

A list of prior testimony is appended to this letter.  A list of publications is included in my attached resume.

## IV.      EXPERIENCE

My resume is appended to this letter.

As a supplement to my resume, I provide the following information.

My introduction to the insurance industry began as an undergraduate student at the University of Colorado.  Although my major was journalism, I took many classes in the business school, all but one focusing on insurance.

For more than 37 years, I have been involved in insurance matters in Colorado.  I have reviewed hundreds, in fact probably thousands, of insurer claim files, including many files involving uninsured and underinsured motorist claims.  I have spoken and taught at numerous seminars for insurers and attorneys; the CPCU society of Colorado; CLE in Colorado; and several private companies, including NBI, that sponsor continuing legal education classes on issues relevant to insurance claim handling, many of which involved UM/UIM issues.  I estimate that I have tried more than 15 trials involving UM/UIM common law bad faith and statutory delay/denial claims in recent years; the

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 3

total number of such trials significantly exceeds that number.  I estimate that in that same time period, I have tried more than 10 cases involving other kinds of insurance claims.  I have handled many more cases involving insurance claim handling in other areas, including underwriting, agency, homeowner insurance, construction defect insurance, liability insurance, commercial insurance, title insurance and professional liability insurance that have not proceeded to trial.  On a daily basis I advise insurers on claim handling matters in Colorado.

Insurance coverage analysis is a significant portion of what I do, and I have taught numerous coverage seminars.  I recently was the speaker for a national seminar on insurance coverage.

I have handled a variety of appeals in matters involving UM/UIM insurance claim handling, including by way of example reported cases such as *Sanderson v. American Family Mutual Insurance Company,* 251 P.3d 1213 (Colo. App. 2010); *Olson v. State Farm Mutual Insurance Company,* 174 P.3d 849 (Colo. App. 2007) and *Vaccaro v. American Family,* 275 P.3d 750 (Colo. App. 2012).  I have also briefed and, in some cases, argued appeals in such cases that resulted in unpublished opinions being issued.

I have also been involved in the legislative process in matters involving insurance legislation.  I note that there is a claim in this matter arising under C.R.S. §§ 10-3-1115 and 10-3-1116.  I met on numerous occasions with stakeholders, including the House

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 4

sponsor, when this legislation was in the drafting stages, and testified at the legislature when the bill was being debated in committee before reaching the full General Assembly.  Since their enactments, as set forth above, I have tried several cases involving claims under the statute to jury verdict, and have briefed issues under those statutes to the Colorado Court of Appeals on two occasions to date.

My experience includes risk management and insurance review and purchase of insurance for the insured in the nonprofit world.  For nearly 25 years, I served on two boards of large nonprofit entities in Colorado.  One of my responsibilities was to work on the policyholder side with the staff on what insurance was needed; to assist in purchasing proper coverage and conduct policy reviews; and to work with the insurers on claims.

I have also represented insureds as personal counsel on many occasions.

I am frequently asked how many insurance claim files I have reviewed.  It is not possible to provide an exact or nearly exact number. As set forth above, in nearly 36 years, the number has to be well over 1,000.  My entire career has involved matters involving claim files, whether I am handling coverage, third party or first party matters. At any point in time, I have had more than 50 active files pending.  Thus, I can estimate that I have reviewed well over 1,000 claim files.

In addition to the foregoing, I have managed claim handling.  Specifically, a title insurer asked me to establish a claim handling function while it was in the process of

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅꜱ Aɴᴅᴇʀꜱᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 5

establishing such functions in-house.  I was responsible for investigation of claims under title insurance policies; evaluations of losses; recommendation for settlement of claims; and all matters necessary to claim investigation and evaluation.  Title policies involve both first- and third-party functions, and I supervised and handled both.  Although specific tasks involved in title insurance claim handling differ from specific tasks in UM/UIM claim handling, the applicable basic industry standards applicable to all insurers apply.  (Title insurers are exempt from the provisions of C.R.S. §§ 10-3-1115 and 1116.)

### V.    DOCUMENTS PREPARED

I have not prepared any documents that I intend to use during testimony.  I might refer to the attached Chronology.

### VI.    SUMMARY OF PERTINENT FACTS

I will not detail all the facts here.  I rely upon the attached Chronology which I incorporate into this section of this report.  I have personally reviewed all documents provided to me.

By way of summary, I provide the following.

Ms. Cribari was insured under the terms of a policy of automobile insurance issued by Allstate. The policy was in effect on February 13, 2015. On that date, Ms. Cribari was involved in a motor vehicle accident. She was not at fault.  She suffered a serious fracture to her right wrist, resulting in the need for surgeries to repair the injury.

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 6

By letter dated March 12, 2015, Dezarae LaCrue of Franklin D. Azar and Associates advised Allstate that she would be representing Ms. Cribari in "[p]ursuit of damages resulting from injuries…" suffered in the accident. Ms. LaCrue stated that Allstate should contact her firm to discuss any medical treatment Ms. Cribari was receiving. She stated that the firm would provide Allstate with any medical bills and medical records it received.

The tortfeasor, Mr. Perko, was insured by GEICO under a policy with a $100,000 liability limit. GEICO did not contest the liability of Mr. Perko.

A file note dated March 27, 2015 entered by Allstate claim representative Paula Humphrey indicates that Ms. Cribari's attorney would order all bills and records and would update her on the medical expenses. No demand had been sent to GEICO as of that date.

By letter dated April 21, 2015, Ms. LaCrue advised Ms. Humphrey that the liability limit was $100,000; that the damages would exceed that amount; and that a UIM claim was being pursued. She sought consent to settle. Consent was communicated by letter dated May 27, 2015. Thereafter, Ms. Cribari recovered the $100,000 liability insurance.

Ms. LaCrue submitted a letter dated August 11, 2015 asking Allstate to evaluate the claim and call her to discuss the evaluation. She asked for a reply by September

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 7

11, 2015.  Ms. Humphrey asked for updates on medical billings.  By letter dated August 21, Ms. LaCrue submitted bills from Orthopedic Associates.  She sent a disk that she seems to suggest was duplicative by letter dated September 3, 2015.

Ms. Humphrey prepared an evaluation dated September 10, 2015.  I refer to the Chronology and Allstate 219-220 for the evaluation detail.  She sought $50,000 in UIM authority.  The request was reviewed by Mr. Vick at Allstate.  He granted the $50,000 in authority.

Ms. Humphrey made a UIM settlement offer in the amount of $35,000 by letter dated September 14, 2015.  However, she pointed out that the "demand," a reference to Ms. LaCrue's letter of August 11, 2015, was incomplete.  Ms. LaCrue wrote back on September 28, 2015 and asked a number of questions as to how Allstate arrived at its offer of settlement.

After interim communications, Ms. Humphrey and Ms. LaCrue agreed that Ms. Humphrey would meet Ms. Cribari at Ms. Lacrue's office.  That meeting occurred on October 22, 2015.  Later that day, Ms. Humphrey authored a letter to Ms. LaCrue asking for more information as detailed in that letter and the Chronology.  She asked for another signed medical and wage authorization and other relevant information.

By letter dated October 29, 2015, Ms. LaCrue advised that Ms. Cribari would be seeing her surgeon by the end of the year and then she would attempt to schedule a

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 8

time for Ms. Humphrey to meet with the surgeon.  Ms. LaCrue would also obtain records from Ms. Cribari's recent therapy and provide those records to Allstate.

By letter dated December 17, 2015, Ms. LaCrue provided completed medical and employment authorizations to Allstate.

Wage and salary information was provided by Ms. Cribari's employer, Assured Title Agency.

By letter dated January 25, 2016, Ms. LaCrue provided a document that she said contained the opinions of Ms. Cribari's surgeon.  Ms. LaCrue met with the surgeon on January 15, 2016, and apparently authored the statement that was signed by the surgeon.  Ms. LaCrue seems to have been a bit critical of Ms. Humphrey for being unable to attend the meeting; however as far as I can tell the meeting was set without clearing the date with her.  Ms. Humphrey was expecting a report written by the doctor after examining the patient.

In all events, Ms. Humphrey performed a re-evaluation on February 15, 2016. She stated:

- Treatment options were limited;

- A wrist fusion would produce a greater disability;

- With the information Allstate had it was time to consider paying the UIM
  limit.  She amended this entry with a note later that same morning as she

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 9

mistakenly believed that the UIM limit was $100,000, not $250,000. She

felt that $100,000 was the right number;

- She sought up to $78,770 with probable future surgery and continued

  problems;

- The evaluation did not include future treatment costs or wage loss.

By letter dated February 16, 2016, Ms. Humphrey offered $100,000 in UIM

settlement.  However, she stated that Allstate was still missing information.  The missing

information included a disability rating, cost estimates for future surgeries, information

regarding further impairment after future surgeries, and information regarding future

wage loss in the event of further surgery.  She indicated that Allstate would consider

such information if provided.

Ms. LaCrue replied by letter dated March 2, 2016.  Among other things, she

stated that she appreciated that Allstate needed additional information to evaluate the

claim (notwithstanding prior requests from her for an evaluation).  She asked if Allstate

would pay for a visit to the doctor to evaluate disability.  Allstate said it would do that.

By letter dated March 24, 2016, Ms. LaCrue stated that she would facilitate an

appointment with the surgeon to assist in answering Allstate's questions.  She asked a

number of questions regarding Allstate's evaluation, as detailed on the Chronology and

in Allstate 1083-1084.  This letter was sent to the wrong address. It was sent to the

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 10

MPC address, notwithstanding the substantial correspondence that she had exchanged with Ms. Humphrey over a lengthy course of time.

Ms. Humphrey then asked for all future surgical costs, wage loss, and disability/impairment ratings. By letter dated April 22, 2016, Ms. Humphrey answered Ms. LaCrue's questions set forth in the March 24, 2016 letter. See Allstate 1087 and the attached Chronology.

By letter dated April 26, 2016, Ms. LaCrue advised that she had no problem with Allstate taking a little more time to respond. Of course, Allstate had responded.

Dr. Choudhry sent a letter to Ms. LaCrue dated June 23, 2016. He expressed his opinions as to impairment ratings.

Ms. LaCrue provided the report from Dr. Choudhry with a cover letter dated July 12, 2016. She asked when she could expect to hear about a re-evaluation of the claim.

Ms. Humphrey performed the re-evaluation on July 27, 2016. She stated:

- Her opinion was probably closer to $120,000 in value;

- Ms. Cribari would likely have permanent impairment even with future surgery;

- Allstate still did not have anything establishing the cost of future surgery;

- This was a difficult claim;

- After accounting for MPC payment and liability recovery totaling $105,000, the GTV was around $225,000.

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 11

Pete Miller of Allstate reviewed the evaluation, and suggested a settlement value of up to $135,000.  He asked for input from Mr. Jorgensen.  Mr. Jorgensen agreed with the $135,000 settlement value.

The claim was re-evaluated.  By letter dated August 8, 2016, Allstate offered $115,000 in UIM settlement money.

I saw no counteroffer or other real response to these offers.  Ms. LaCrue did state her opinion that the claim was worth the policy limit in her letter of March 2, 2016.

This action was filed on August 29, 2016.

## VII.   INSURANCE INDUSTRY STANDARDS

Claim handling standards are generated from several sources.  One of the main sources of claim standards is the common law, arising from appellate decisions of the courts in particular jurisdictions.  There are also standards that arise from statutes, regulations, and sometimes Division of Insurance Bulletins (by their own language, DOI bulletins do not establish mandatory standards).  Some industry standards are generated by industry-wide practices, although the fact that one insurer does things in a particular way does not create an industry standard.

There are also textbooks and treatises that can be helpful.  Allan Windt, *Insurance Claims and Disputes*, is a treatise that directs the reader to thousands of cases decided from virtually every jurisdiction, although this treatise is directed more to third party claims.

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 12

Insurers owe a duty of good faith and fair dealing to their insureds in the claim handling process. Insurers must be fair and reasonable. They should act promptly in reviewing information. With the assistance of the insured, insurers should attempt to obtain all relevant medical records and consider the same. Claim evaluations should be fair, and based upon an objective review. It is noteworthy that UM/UIM insurance differs from other types of insurance. As the Colorado Supreme Court has recognized:

> In contrast, the underlying action here involves a type of "first-party" claim in which Sunahara is suing his own insurance company, State Farm, for UIM benefits. We noted in *Silva* that first-party cases differ from third-party cases because, in a first-party action, the defendant insurance company owes the plaintiff-insured a duty of good faith. *Id.* at 1193. The UIM context of this case, however, places the insurance company in the "unique role" of becoming almost adversarial to its own insured. *Peterman v. State Farm Mut. Auto. Ins. Co.,* 961 P.2d 487, 494 (Colo.1998). UIM coverage is designed to put a driver who is injured by an underinsured motorist in the same position as if the underinsured motorist had liability limits in amounts equal to the insured's coverage. *USAA v. Parker,* 200 P.3d 350, 358 (Colo.2009). Thus, the fact-finder in a UIM case must weigh the evidence presented by the defendant insurance company, essentially standing in the shoes of the underinsured motorist, against the evidence presented by the injured plaintiff. The defendant insurance company will naturally attempt to minimize the plaintiff's damages in such a case because doing so serves the company's financial interests. As such, the scope of discovery of reserves and settlement authority in first-party UIM actions is similar to the scope of discovery in third-party actions, like *Silva,* because the relationship between the parties is similarly adversarial. *Sunahara v. State Farm,* 280 P.3[rd] 649, 657 (Colo. 2012).

That is not to say that the claim *process* should be adversarial. The process should be cooperative and intuitive. The vast majority of claims are resolved because the policyholder wants to make and support a claim by offering the materials that prove

S<small>WEETBAUM</small> S<small>ANDS</small> A<small>NDERSON</small> PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 13

the claim and the insurer wants to resolve the claim.  That said, even though the nature

of UM/UIM insurance coverage can place the relative interests of the insured and

insurer in essentially adversarial positions because the insurer can assert all defenses,

including defenses to liability, causation and the amount of damages sought against the

tortfeasor, the process should be professional and cordial.  Mere disagreements do not

rise to the level of bad faith conduct.  All responsible insurers must be in a position to

fully evaluate a claim based upon all available information.  The insurer is highly

dependent upon the contractual obligation of the insured to cooperate in providing

complete information relevant to evaluating the injuries claimed.

Each claim is to be handled on its own merits.  Insurers are afforded wide latitude

in their investigations of first party claims.  *Travelers Insurance Co. v. Savio,* 706 P.2d

1258 (Colo. 1985).  The policyholder must cooperate and provide relevant materials to

support the claim and cooperate with the insurer.  *State Farm v. Brekke,* 105 P.3d 177

(Colo. 2004).  There is no fiduciary or quasi-fiduciary relationship in the first-party claim

context.  *Brodeur v. Am. Home Assurance Co.,* 169 P.3d 139, 152 (Colo. 2007); *Olson v.

State Farm Mutual Automobile Insurance Company,* 174 P.3d 849, 856 (Colo. 2007)

(applying that rule in the UM context).

The duty of good faith and fair dealing is actually reciprocal.  *Brekke, supra.*

The issue is not whether an insurer is "right" or "wrong" in its conclusions or

evaluations.  *Wheeler v. Reese,* 835 P.2d 572 (Colo. App. 1992).  A dispute about the

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 14

value of a claim does not mean that the insurer has acted unreasonably. Resort by an insurer to a judicial forum is not unreasonable. *Brandon v. Sterling Beef,* 827 P.2d 559 (Colo. App. 1991).

Insurers owe all of their insureds the duty to pay only meritorious claims and to neither underpay nor overpay claims. The ultimate job of the claim department is to pay what is owed on individual claims. It is detrimental to all insureds if insurers fail to discharge their obligations to investigate claims and pay only meritorious claims. This responsibility owed to all policyholders whether the insurer is a stock or mutual company. *Warren v. Liberty Mutual Fire Insurance Company,* 691 F. Supp. 2d 1255, 1271-1272 (D. Colo. 2010). Indeed, few insurers would survive if they succumbed to all demands for policy limits made by attorneys representing UM claimants. First-party insurers may look out for their own interests as well as those of the insured making the claim. The "equal protection" rule does not apply in the first-party context. *Zolman v. Pinnacol Assurance,* 261 P.3d 490 (Colo. App 2011). Insurers must, of course, responsibly maintain financial health while discharging their responsibility to pay what is owed on individual claims.

Again, each claim is to be handled on its own merits. Although an insurer owes a duty to all policyholders, and to itself, to pay only meritorious claims and then only in the amount owed, individual claims must be evaluated on the basis of the facts and

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 15

information presented relevant to that particular claim. Fair payment of claims is consistent with the principles of financial responsibility and health.

It is not unreasonable for an insurer to challenge a claim that is "fairly debatable." The value of an injury claim is almost always debatable. It is the claim representative's job to attempt to estimate what a reasonable jury might find the UM insured is entitled to collect from the tortfeasor. The Colorado Court of Appeals has rejected the notion that with the benefit of hindsight, an insurer can be held liable for unreasonable conduct for underestimating what a jury might do. *Sanderson v. American Family,* 251 P.3d 1213 (Colo. App. 2010).

There is no duty to continue to negotiate or to pay a settlement after litigation is filed. *Sanderson, supra.* That is not to say that the duty to continue to consider information and act reasonably in claim handling does not continue during litigation. Rather, if a claimant decides to sue the insurer, any duty to negotiate or pay as part of the duty of good faith and fair dealing is suspended during the litigation.

There is no duty to negotiate a settlement of a UM/UIM claim if there is a genuine disagreement as to the amount of compensable damages payable under the terms of an insurance policy. *Vaccaro v. American Family,* 275 P.3d 750 (Colo. App. 2012).

The industry standard is that claims are evaluated within a range of values, rather than one precise number. An effort to achieve settlement within a reasonable range of

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 16

values is standard.  There is no duty to disclose the range.  if appropriate based upon new evidence, management reviews or other factors.

The Colorado Division of Insurance has issued a regulation addressing the prompt payment of property and casualty insurance first-party claims.  Specifically, 3 CCR 702-5, Regulation 5-1-14 provides, among other things, that a decision on a claim and/or payment of benefits must be made within 60 days after receipt of a valid and complete claim unless there is a "reasonable dispute" between the parties concerning the claim, and provided the insured has complied with the terms and conditions of the policy.  Although there is no question as to the applicability of the regulation to a statutory delay claim under C.R.S. §10-3-1116, the regulation apparently applies to the claim process itself.  It is my opinion that the regulation, at a minimum, applies to the contract claim and common law bad faith claims.

Under the regulation, a valid and complete claim is deemed received by the insurer when, among other things, all information and documents necessary to prove the insured's claim have been received by the insurer; and there are no indicators on the claim requiring additional investigation before a decision can be made; and/or any litigation on the claim has been finally and fully adjudicated.  A reasonable dispute may include, but is not limited to: information necessary to make a decision has not been submitted or obtained; litigation is commenced on a claim; or negotiations are in process to determine the value of the claim.

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 17

Evaluation of the value of a UM/UIM claim is not subject to a formula, exacting standards or review. Evaluation of claims is not a science. It is unfair to assume that just because the insured, or insured's counsel, disagree with an insurer's valuation of a claim, the insurer has acted unreasonably.

However, a claim representative should not try to determine what a claim is worth by trying to match wits or trade dollars with an attorney. It is extremely common for insureds' attorneys to make policy limits demands. That does not mean, of course, that every such claim is worth policy limits. Some are; some are not. No one really knows how much a claim is worth until a jury comes out with a verdict. There are so many variables in trial work, including most notably the facts and the law; the quality of counsel; pretrial rulings; evidentiary rulings; venue; jury pool makeup; and many intangible factors that drive trial results that assuming that one jury verdict is an accurate predictor of the result in a different trial is not the standard. The most important factor to remember is that each claim is to be handled on its own merits given all of the information that has been made available to the insurer. There is no industry standard that mandates the use of *Jury Verdict Reporter* or other media that report trial results.

An evaluation of a claim does not represent an agreement or position of an insurer that any amount is owed. An evaluation, again typically within a range of values, represents an amount that the insurer believes is a value at which a claim might or

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 18

should settle.  An insurer does not owe any amount just because it has performed an evaluation.  *Sunahara, supra.*

The same standard applies to offers and/or payments made in the course of negotiating, or attempting to negotiate, the settlement of a claim.  An offer made for purposes of settling a claim does not constitute an admission that the insurer agrees the case is worth that much.  Just as is the case in many kinds of disputes, whether involving insurance, personal injury, commercial transactions, entity formation and management – offers of compromise do not constitute admissions.  That is public policy that is reflected in rule 408 of the Colorado Rules of Evidence.  The reason for that policy is that if an insurer cannot make a settlement offer without being held to that offer as an admission would discourage settlement of disputed value claims such as this one. The standard works both ways.  An insured can make a settlement ovation without being forever bound to that number.  Anyone who has spent any time in this business knows that the ultimate determination of value by a finder of fact can vary wildly from the evaluations of the attorney representing the insured and insurer.

The same standard applies to the process of reserving.  This standard is made abundantly clear by the decision in the *Sunahara* case.  Reserves do not represent settlement authority or even the value of the claim.  Obviously, although reserves are set on claims, evaluations are still prepared.  Reserves are set for statutory and

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 19

regulatory compliance.  Reserves are often adjusted as claim information is provided by the policyholder.

## VIII.    CONCLUSIONS AND OPINIONS

It is my opinion that Allstate had reasonable bases for its conclusions and actions.  It did not act unreasonably, meaning in this context that it did not violate industry standards in its claim handling process.

### A.    The Process and Methodology

In evaluating claim files and insurer conduct, the process is not to review the file and find any possible criticism of the work.  There are probably very few claim files that can be reviewed by another knowledgeable person with which the reviewer cannot find criticism.  In other words, the standard is not one of perfection.  The fact that something could have been done better, or more quickly, or more to the liking of a cross-examining attorney or other person is hardly the measure of the reasonable conduct of the insurer.  The same can doubtlessly be said of files and/or work of lawyers, doctors, accountants, teachers, mechanics, and virtually all other working persons.

Rather, the standard is one of reasonableness under the circumstances.  The circumstances most often involve the facts of the particular claim in issue.

Insurance industry claim handling standards are most often not discrete rules that apply in all situations.  Claim handling is often referred to as being "more art than science."  The same might be said of the standards that apply.

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 20

There can be things contained in claim files that one might opine are inconsistent with some industry standard from somewhere.  The fact that one discrete act might be inconsistent with someone's interpretation of these often vague industry standards does not mean that the insurer acted in bad faith in handling the claim.  One must look at the overall claim handling and further examine the specific act that is alleged to have been taken in bad faith and the consequences of that act.

Thus, the proper methodology here is not to look at the file to find things that one might think should have been done differently; nor is it to look at the file and find things that were done to perfection.  The standard is not to determine whether the insurer was wrong or right.  The proper methodology is to review the file for breaches of industry standard that rise to the level of "unreasonable conduct" or "unreasonable position," meaning knowingly or recklessly unreasonable conduct, or conduct or position taken without a reasonable basis.

### B.    This UIM Claim Handling Process

The UIM claim handling process is often described as including at least three primary tasks:  investigation, evaluation and negotiation.

(1)    Investigation

It is my opinion that Allstate's investigation of this claim complied with applicable industry standards in Colorado.

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 21

As implied by the name, the process of investigation is that of gathering information relevant and necessary to handle the claim. The investigation process can only be successful if the insured cooperates and provides relevant information or gives the insurer the information required for the insurer to obtain the information on its own. The investigation should be fair and objective. The insurer should be looking for relevant facts and information that support the claim. An insurer should not have a systemic culture of looking for information to deny claims. The investigation should be balanced and consider the claim at issue on its own merits.

There are several tools available to the insurer in the process of investigation. Not every tool is appropriate for every claim. These investigation aids should be utilized when necessary and not just because they exist or an attorney is or has been critical on the sole basis that one *could* have been used.

As is the case here, when the insured is represented by an attorney, much information is often provided by the attorney. Here, all communication on the UIM claim of Ms. Cribari was handled by attorney Dezarae LaCrue. Ms. LaCrue promised to provide, and in fact provided, considerable information to Allstate. When an attorney cooperates and represents that she will provide relevant information, the insurer has a right to rely upon that representation. The information provided by counsel might or might not suggest that further investigation is necessary. Here, Allstate appropriately relied upon Ms. LaCrue's statement that she would provide information, which she did.

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 22

Insurers have the contractual right to obtain an authorization for release of medical or other information from third parties. Insureds must cooperate and provide such authorizations when reasonably sought. Allstate sought, and Ms. LaCrue provided, authorizations for Allstate to obtain medical and employment information.

Allstate took a recorded statement from Ms. Cribari early in the process, on February 16, 2015. Ms. Humphrey also met personally with Ms. Cribari and Ms. LaCrue in Ms. LaCrue's office on October 22, 2015. Neither a recorded statement nor a personal meeting is required by any industry standard. In my experience, personal meetings are the exception, not the rule. Allstate arguably performed at a level that exceeded industry standards.

I saw no instance in which Allstate failed to conduct a reasonable, balanced, and fair investigation. It is my opinion that Allstate's investigation complied with industry standard.

(2)    Evaluation

The beginning standard is found in C.R.S. § 10-4-609, as well as the insurance contract. UIM insurance is in addition to any legal liability coverage and shall cover the difference, if any, between the amount of the *limit* of any legal liability coverage and the amount of the damages sustained, up to the UIM limit. The amount of *coverage* shall not be reduced by a setoff from any other coverage, including liability insurance, MPC, health insurance, or other uninsured or underinsured motor vehicle insurance.

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 23

By way of example, if a UIM insurer agrees that the value (not settlement ranges of value) of a claim exceeds the amount of the available liability limit, the UIM carrier should not await exhaustion of the liability limit before paying what it agrees is owed in UIM benefits. It is really a matter of the value of the claim. Again, however - the fact that an evaluation has been done is not by itself an admission that any amount is owed. Even if a settlement offer is made, the standard is that the same is not an admission that any amount is owed.

In order to be able to prepare an evaluation, the insurer needs the relevant information that supports the claim. That information should be received, with the insured's cooperation, through the investigation. The process should not be hard. The insured wants benefits paid under the coverage and should be motivated to cooperate, getting supporting information to the insurer, and attempting to settle the claim. Insurers want to get claims settled and to pay what is owed. Insurers do not want disputes. Insurers don't want to get sued.

That said, disputes happen and are part of the process. As set forth above, the Colorado Supreme Court, in *Brekke,* recognized the somewhat adversarial relationship that a UIM carrier and insured can have. In fact, the court, in footnote 11, stated that there is considerable recognition that the UM insured and UM insurer have a primarily adversarial relationship under a UM contract. The fact that the parties disagree on the

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 24

value does not mean that anyone has acted unreasonably or has breached the reciprocal duties of good faith and fair dealing. It just means that, often, the disputed value will need to be resolved by a finder of fact, most often a jury.

The purpose of evaluation is to place a figure on the value of a claim. It is most always for the purpose of negotiating a settlement. Here, Allstate believed that there was never a doubt that Ms. Cribari was entitled to something in the way of UIM compensation. She suffered a serious injury and underwent surgeries. She had impairment. She lost time from work and income. Allstate recognized from early on that Ms. Cribari was entitled to compensation. The issue was determining how much the claim was worth for settlement purposes.

It is not for me to evaluate or question Allstate's ultimate estimate of value. Rather, I examine the process. Allstate considered all information provided by Ms. LaCrue and information it obtained from outside sources such as Ms. Cribari's employer. The evaluation did not fail to address the issues, including the fundamental issues surrounding the injury; treatment; and impact of the injury on Ms. Cribari's life and employment. The evaluation considered the categories of damage that a UIM claimant is legally entitled to recover from the tortfeasor, including economic losses in the form of medical expenses and lost income; and noneconomic losses that are listed in C.R.S. § 13-21-21-102.5(1) and C.J.I. Civ. 6:1. Evaluation is more art than science. It requires judgments. These can always be challenged by someone, often attorneys, who

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 25

disagree.  That does not mean that the insurer has ac ted in bad faith.  It is my opinion that Ms. Humphrey applied good claim handling here that met or exceeded industry standard.

I add that Ms. Humphrey candidly acknowledged that this was a difficult claim to evaluate.  Many claims are hard to evaluate.  Two other experienced members of the Allstate claim team, Messrs. Vick and Miller, reviewed the evaluation, showing that Allstate provided claim personnel with claim handling resources, one of the most valuable being the input from other experienced claim personnel.

The use of computer software in the claim handling and evaluation process as long as it is used properly.  Blind adherence to a value taken from such a program without exercise of good claim handling judgment is most often not going to be proper use of such tools.  Ms. Humphrey used this kind of tool appropriately.

Finally, the insurer's evaluation appropriately considered Ms. Cribari's liability and MPC recovery (at the time of this claim, non-duplication of MPC coverage was considered the standard).  The net evaluation before this lawsuit was filed would have meant that Ms. Cribari's total recovery would have been $220,000, composed of the $100,000 from GEICO in liability coverage; $115,000 in UIM benefits and $5000 in MPC benefits.  Whether that is the "right" value (there is no "right value" in the vast majority of claims based upon bodily injuries including noneconomic damages) is fairly debatable.

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 26

Ms. LaCrue stated that she believed the case was worth the $250,000 UIM limit which would result in a gross recovery of $355,000 ($100,000 liability insurance + $250,000 UIM + $5000 MPC). But these numbers demonstrate that evaluating a bodily injury claim is not science. People can disagree without having acted badly.

It is my opinion that the evaluation process complied with industry standards. I saw no instance in which Allstate failed to obtain or consider relevant information.

(3)    <u>Negotiation</u>

Allstate attempted negotiation. It made three offers; each one increasing over the prior offer based upon new information provided by Ms. LaCrue or otherwise obtained. An insurer cannot force a counteroffer. The parties were $115,000 apart in their then existing evaluations. They never had the chance pre-litigation to see if they could close that gap further because Ms. Cribari elected to sue Allstate instead of negotiating (at all), which of course is her right.

Allstate made appropriate efforts to negotiate a settlement based upon reasonable evaluation process. It is my opinion that it acted well within industry standards such as they exist on this subject.

**B.    <u>No Unreasonable Denial</u>**

This claim was not denied.

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 27

### C.   <u>No Unreasonable Delay</u>

It is my opinion that no unreasonable delay is attributable to Allstate.  Delay as used in this industry is not measured by simply counting days, weeks, or any other increment of time; or whether an insurer has declined to pay limits or some other number demanded on behalf of the policyholder.  Rather, delay is measured by the facts of the specific claim, and application of industry standards to those specific facts.  It is not clear to me on what basis there could be any claim that Ms. Cribari's claim was unreasonably delayed, other than the fact that she thinks she is owed money that she has not been paid prior to the commencement of litigation.  That is not a delay as that term is used in this context.

The Chronology shows that medical and other highly relevant claim information that supported the claim was provided continuously.  Ms. LaCrue continued to provide highly relevant claim information at least until June 30, 2016.

Ms. LaCrue's demand of August 11, 2015, if in fact it is a demand, was premature.  Much information was provided during the year after that date prior to this lawsuit being filed.

This file documents Allstate's continuous attention to this claim.  As detailed in the attached Chronology, there are many letters advising that more information was needed; that Allstate was awaiting information promised; and advising of the status.

S<small>WEETBAUM</small> S<small>ANDS</small> A<small>NDERSON</small> PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 28

To put this in perspective, it is important to note that Allstate was not informed that Ms. Cribari was actually pursuing a UIM claim until Ms. LaCrue sent her letter dated April 21, 2015. Consent to settle with the tortfeasor was communicated on May 27, 2015. The following dates are demonstrative:

- On July 8, 2015, Ms. LaCrue advised that Ms. Cribari was still treating.

- A "demand" was submitted on August 11, 2015.

- A supplement to the demand was submitted on August 21, 2015.

- On October 29, 2015, Ms. LaCrue advised that Ms. Cribari would be seeing her surgeon by the end of the year and that she would attempt to schedule the time to meet with the surgeon and that she would obtain therapy records.

- Authorizations to obtain wage loss information were provided on December 17, 2015.

- By letter dated March 24, 2016, Ms. LaCrue advised that she would obtain additional information from the surgeon.

- Information regarding future surgical expense was not provided as far as I can tell from the file.

Another basis for my opinion in this regard is that, as more particularly set forth above, Regulation 5-1-14 establishes an industry standard regarding claim resolution. Although the regulation does not apply directly to a claim under C.R.S. § 10-3-1116(1), it

Sᴡᴇᴇᴛʙᴀᴜᴍ Sᴀɴᴅs Aɴᴅᴇʀsᴏɴ PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 29

does apply to analysis of the obligation under the contract to pay benefits.  The facts addressed above and in the Chronology show that there were indicators on the claim requiring additional investigation before a decision could be made.  Ms. LaCrue was indicating that more information would be provided when it became available.  There was a reasonable dispute regarding the claim based upon the language of the Regulation. Litigation on the claim had not - and has not - been finally and fully adjudicated.  There was no unreasonable delay caused by Allstate.

These factors are factual examples that strongly support and are demonstrative of my conclusion that there was no delay at all caused by Allstate.

**D.    This Claim Presents a Fairly Debatable Value Dispute;  Not Unreasonable Delay or Unreasonable Conduct**

It is my opinion that this case presents a perfect example of a straightforward value dispute. The claim handling is in many respects exemplary.  It is my opinion that Allstate acted reasonably, and did not lack a reasonable basis for its position and actions.   The industry standard is that value disputes do not rise to the level of unreasonable conduct or bad faith.   The standard is also that it is reasonable to challenge the value of a claim that is "fairly debatable."  There is no one definition of that term.   In Lee R. Russ & Thomas Segalla, *Couch on Insurance,* 3d Ed. § 204:28, the authors state as follows:

SWEETBAUM SANDS ANDERSON PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 30

Accordingly, insurers are commonly held to a standard of whether their alleged justification for their non-payment or delayed payment is 'fairly debatable,' or similar concepts, such as lack of reasonable basis. ***A 'debatable reason,' for purposes of determining whether a first-party insurer may be subjected to bad faith liability, means an arguable reason, a reason that is open to dispute or question***.   (Footnotes omitted; emphasis supplied).

Another court has stated: if evidence creates a factual issue as to the claim's validity, there exists a debatable reason for denial, eliminating the bad faith claim; a debatable reason means an arguable reason, one that is open to dispute or question. *Prince v. Bear River Mutual Insurance Co.,* 56 P.3d 524, 535 (Utah 2002).   Another court has stated that if there is a genuine disputed issue as to the nature and extent of the insured's injuries, or the value of the insured's damages, a court can almost always decide that the claim was fairly debatable as a matter of law.   *Bellville v. Farm Bureau Mutual Insurance Company*, 702 N.W.2d 468, 473 (Ia. 2005).

These comments fall well within the industry standard in Colorado.  Although the fact that a claim is fairly debatable does not, by itself, insulate an insurer from a finding of unreasonable conduct, if a claim is fairly debatable, the industry standard is that it militates against finding of a breach of industry standard.  Moreover, there is no duty to

Sweetbaum Sands Anderson PC

Kurt H. Henkel, Esq.
Nicole L. King, Esq.
*Cribari v. Allstate*
May 12, 2017
Page 31

even negotiate settlement of a UIM claim if there is a genuine dispute over the value of the claim.

It is unreasonable for lawyers to hold claim representatives to a standard to which they cannot be held themselves. It is not legal malpractice for a personal injury attorney to be "wrong" in his or her best evaluation as to what will happen as long as the attorney complied with the standard of care; it is not insurance bad faith for a claim representative to be "wrong" in attempting to evaluate a claim with a view to the same end: what will a finder of fact believe the claim is worth?

As set forth above, disagreements happen. That does not mean that Allstate acted unreasonably. If insurers were not allowed to disagree with others on the value of claims, there would be no point in evaluating claims, as all claims would doubtlessly be policy limit claims. All policyholders would have to subsidize overpayment of claims or payment of claims that should result in no payment. Insurance would probably become prohibitively expensive at least to some.

Again, Allstate complied with industry standards.

Thank you for seeking my consultation on this claim file and the conduct of Allstate. Please let me know if you have questions or need further review or analysis.

Very truly yours,

Jon F. Sands